**Michael Anthony STAMATHIS,
Plaintiff–Appellee,**

v.

**FLYING J, INCORPORATED, a
Delaware Corporation; David L.
Hansen, Defendants–Appellants.**

No. 02–2297.

United States Court of Appeals,
Fourth Circuit.

Argued: May 7, 2003.

Decided: Nov. 10, 2004.

**ARGUED:** Miguel Angel Estrada, Gibson, Dunn & Crutcher, L.L.P., Washington, DC, for Appellants. Monica Taylor Monday, Gentry, Locke, Rakes & Moore, Roanoke, Virginia, for Appellee. **ON BRIEF:** F. Joseph Warin, Andrew S. Tulumello, Harry M. Gruber, Gibson, Dunn & Crutcher, L.L.P., Washington, DC; Kenneth J. Ries, Brian J. Brydges, Johnson, Ayers & Matthews, Roanoke, Virginia, for Appellants. Paul G. Klockenbrink, Gregory R. Hunt, Gentry, Locke, Rakes & Moore, Roanoke, Virginia, for Appellee.

Before WIDENER, MICHAEL, and GREGORY, Circuit Judges.

Affirmed by published opinion. Judge WIDENER wrote the opinion, in which Judge MICHAEL and Judge GREGORY concurred.

## OPINION

WIDENER, Circuit Judge:

Plaintiff Michael Stamathis brought this action against defendants Flying J, Inc. and David Hansen, an employee of Flying J, Inc., alleging defamation, malicious

prosecution, tortious interference with employment, and a claim for punitive damages. A jury found in favor of the plaintiff on the defamation and malicious prosecution counts and awarded him compensatory damages in the amount of $250,000, and punitive damages in the amount of $450,000 against Flying J, Inc. and $5,000 against David Hansen. The district court subsequently reduced the punitive damages awarded against David Hansen to $0 and against Flying J, Inc. to $350,000, pursuant to Va.Code Ann. § 8.01–38.1 (1996).[1] The defendants appealed, asserting that they are entitled to judgment as a matter of law under Virginia's merchant's immunity statute, Va.Code Ann. § 18.2–105 (1996), and that both the punitive and compensatory damages awards should be struck down as excessive.[2] For the reasons set forth below, we affirm the judgment of the district court.

## I.

At the time of this incident, Stamathis was a long-haul truck driver and had been employed by J–Mar Trucking, Inc. (J–Mar) for three years. J–Mar paid Stamathis for driving a mileage rate of 30 cents per mile, and J–Mar furnished Stamathis' gas by providing him with a "T–Chek" fuel card, which operates in a similar manner to a credit card. J–Mar requires its employees to stop at designated fuel stops along the road, many of which

are operated by the defendant, Flying J, Inc. Stamathis made frequent stops at various Flying J gas stations throughout the country and enrolled in Flying J's Frequent Fueler Program. He was issued a card with his name on it and as a member he was entitled to certain benefits, such as free showers and other catalog gifts.

On the night of December 18, 2000, Stamathis was en route from Ohio to Atlanta, Georgia on I–81. At around 8:00 pm, Stamathis pulled off the interstate to refuel and rest at the Flying J Travel Plaza near Wytheville, Virginia. The truck stop was particularly busy that evening and Stamathis had to wait approximately fifteen minutes before he was able to pull his tractor trailer up to the fuel pump. Once at the pump, Stamathis inserted his T–Chek fuel card into the card reader at the fuel pump. In order to monitor their drivers actions, J–Mar requires drivers to input several pieces of information when using the fuel card, i.e. driver's number, trip number, and odometer reading. This information must be entered before the fuel can be purchased. Stamathis inserted his card, entered his tractor number, his trip number, his mileage, and his frequent fueler number. The card reader indicated that he would be ready to fuel, however, when he attempted to pump the fuel it would not work. Stamathis then picked up the courtesy phone at the fuel pump and called the Flying J fuel desk. Stamathis

---

1. The maximum possible penalty available under Virginia law for a punitive damages award is $350,000. See Va.Code Ann. § 8.01–38.1 ("In any action accruing on or after July 1, 1988 ..., the total amount awarded for punitive damages against all defendants found to be liable shall be determined by the trier of fact. In no event shall the total amount awarded for punitive damages exceed $350,000.").

2. Three arguments are encompassed in this claim. First, the defendants assert that the

punitive damages award should be set aside because there is no evidence that Flying J employees acted with "actual malice." Second, they contend that the compensatory damages award is exorbitant because Stamathis' out-of-pocket damages were limited to $10,000 and the evidence of his emotional distress was not enough to justify the remainder of the award. Lastly, they argue that the punitive damages award was excessive because it was the product of passion and prejudice.

explained the problem to Kristy Bowman, the Flying J cashier, and, at Bowman's request, Stamathis provided her with his company name and tractor number. When Bowman asked Stamathis for his mileage, however, Stamathis was unable to remember it and told her that he would have to go get his mileage notebook from inside his truck cab. Stamathis testified that Bowman told him not to bother, that he could just bring in his mileage when he entered the store. The pump then began operating and Stamathis proceeded to pump his fuel.[3]

While his tanks were filling, Stamathis entered the store with his mileage notebook. Stamathis testified that he approached Kristy Bowman to give her the mileage, but that she was busy with another customer and told him to come back with his mileage when he was finished fueling. Stamathis then turned to another clerk and asked him to take the mileage, but the other clerk also told Stamathis to bring the mileage into the store later. Following this exchange, Stamathis went back out to his truck, finished fueling, added fuel additive to his tanks, cleaned his windows, and then moved his truck forward so that the truck behind him could begin refueling. Stamathis returned to the store, and after washing his hands, he approached the fuel desk again. Defendant David Hansen was the desk manager and was standing behind Bowman when Stamathis approached the desk the second time. Stamathis handed Bowman his T-Chek card and his Frequent Fueler card, but had forgotten his mileage notebook in his truck cab. After running the cards, Miss Bowman told Stamathis that the transaction would not go through because

she still needed the mileage. Stamathis then exited the store to get his mileage from inside the truck.

Once Stamathis reached his truck, he heard over his CB radio that other drivers were complaining that his truck was holding up those waiting to pump fuel. In response, Stamathis got into his truck and tried to find a place to park. The Flying J parking lot was full, and many other truck drivers were circling the lot trying to find parking. Thus, Stamathis pulled onto the service road, passed the entrance ramps to I-81, and pulled his truck into the nearby Citgo truck stop to park.

Hansen and Miss Bowman observed this action from the store and saw Stamathis drive his truck out of the Flying J parking lot and to the Citgo parking lot, bypassing the ramps to I-81. At that point, Hansen told Miss Bowman to call the police while Hansen called his boss, Ronald Hicks. Mr. Hicks told Hansen to see if Stamathis would pay for his fuel, but if not, then to have him arrested. Hansen then called J-Mar, identified Stamathis by name and truck number and said that Stamathis had driven off the lot without paying for his fuel. The dispatcher told Hansen to give her a minute and that she would take care of it. At that point, however, per Hansen's instructions, Miss Bowman had already called the police.

Meanwhile, Stamathis had parked his truck at the Citgo truck stop and entered the Citgo station to use the bathroom and buy a carton of Pepsi. When Stamathis began to walk back to his truck, Deputy Sheriff Jeffrey Hall stopped Stamathis and told him that Flying J had reported that

---

**3.** It is unclear from the record exactly how this exchange ended. Kristy Bowman testified that Stamathis told her that he would have to get his mileage in his cab and that he then hung up the phone. She also stated that

she did not activate his pump, but that she believed that he must have turned the pump on with his Frequent Fueler card. Defendant David Hansen, however, testified that Miss Bowman turned on the pump for him.

he had stolen fuel. Stamathis was trying to explain to the deputy what happened when Hansen approached the two men with "the biggest grin on his face." Stamathis said to Hansen, "what the heck are you doing telling the sheriff that I'm stealing your fuel.... You know that we drivers park over here once your lot fills up." This angered Hansen. Hansen stated that Stamathis started complaining about how poorly he had been treated by the Flying J employees, that Stamathis would not discuss paying for the fuel, and at that point Hansen said that he did not want to argue with Stamathis anymore and told the deputy to arrest him. The deputy and Hansen then discussed the situation privately, at which point Hansen was informed that Stamathis would not be arrested unless Hansen instructed and that Hansen would have to travel to the Wytheville Sheriff's Office, several miles away, to file a complaint. Hansen agreed.

Deputy Hall took Stamathis into custody at 9:00 pm, and Stamathis was placed in the patrol car and transported to the Sheriff's Office. Hansen arrived and swore out a criminal complaint against Stamathis, and at 9:34 pm, Stamathis was booked for petit larceny in violation of Va.Code Ann. § 18.2-96. Stamathis appeared before a magistrate judge, posted a $1,000 bond, and was released on his own recognizance at 9:44 pm. Following his release, Stamathis returned to the Flying J in a taxicab, and on the advice of a J–Mar dispatcher, went into the Flying J to ensure that his fuel was paid for. He arrived at the Flying J at approximately 11:00 pm to ensure that the transaction had been completed. Afraid that Hansen would have him arrested again, Stamathis tried to have a manager from the adjacent restau-

rant accompany him, but was informed that the restaurant and the fuel desk were separate. Hansen was behind the desk when Stamathis arrived, and Stamathis testified that Hansen looked as if "he was getting ready to jump [over the counter]." Stamathis gave his T–Chek and Frequent Fueler cards to Bowman, who carried the cards to Hansen, who then proceeded to imprint the T–Chek card and complete the transaction. During this exchange, no one asked Stamathis for his mileage. Documentation from T–Chek, the fuel card company, indicates that Stamathis' fuel transaction was processed at 9:16 pm, Central Standard Time. On March 21, 2001, Stamathis appeared in Wythe County General District Court for his criminal trial on the larceny charge, but the prosecutor moved that the case be *nolle prosed*, and the charges against Stamathis were so dismissed. Stamathis was unable to work for J–Mar while the charges were pending because he was concerned that he would be out of the area and unavailable to appear in court on his trial date. Stamathis no longer works for J–Mar.[4]

On October 23, 2001, Stamathis filed this complaint against Flying J, Inc. and Hansen, claiming defamation, malicious prosecution, tortious interference with employment, and punitive damages. The complaint sought $250,000 in compensatory damages and $350,000 in punitive damages. Defendants moved for summary judgment on all claims, arguing that they were immune from liability under Va.Code Ann. § 18.2-105 because probable cause existed to believe that Stamathis was committing larceny. In addition, the defendants argued that there was not sufficient evidence to support a finding that defendant Hansen knew his allegedly defamato-

---

**4.** It is not clear from the record whether Stamathis voluntarily quit his job or whether the defendants' statements to J–Mar and pros-

ecution of the larceny charge resulted in his leaving J–Mar.

ry statements were false, that the defendants were motivated by actual malice to support the punitive damages claim, and that Stamathis had failed to establish the necessary elements of a tortious interference claim.

On July 9, 2002, the district court denied the motion, finding that "there is evidence from which a jury could reasonably find that at the time of Stamathis' detention and arrest, Hansen neither believed nor had probable cause to believe that Stamathis had shoplifted fuel," and therefore, the section 18.2–105 immunity would not apply. *Stamathis v. Flying J, Inc.*, No. 7:01cv00838, 2002 WL 1477586, *6, 2002 U.S. Dist. LEXIS 12398, *17 (W.D.Va. July 9, 2002). Additionally, the court found there was sufficient evidence to withstand summary judgment regarding the defamation claim, to support a jury finding of actual malice for the punitive damages claim, and to conclude that the defendants used improper methods to interfere with Stamathis' employment. *Stamathis*, 2002 WL 1477586, at *7, 2002 U.S. Dist. LEXIS 12398, at *17–19.

The case proceeded to a two-day jury trial on July 15 and 17, 2002.[5] At the close of Stamathis' case, the defendants moved for judgment as a matter of law on all claims. The district court dismissed Stamathis' tortious interference claim, but denied the motion with respect to the other claims. The defendants renewed their motion for judgment as a matter of law at the close of all the evidence, but the district court again denied the motion.

On July 17, 2002, the jury returned a verdict in favor of Stamathis on both the defamation and malicious prosecution claims. Following, in the damages phase, the jury awarded compensatory damages in the amount of $250,000 and punitive damages in the amount of $450,000 against Flying J and $5,000 against David Hansen. The district court later reduced the punitive damages award to $350,000 against Flying J only, pursuant to Va.Code Ann. § 8.01–38.1. The defendants appeal, and we affirm.

## II.

■ We review *de novo* a district court's denial of a motion for judgment as a matter of law. See *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727 (4th Cir.1999). A district court's denial for a request for a new trial or request for a remittitur rests with the sound discretion of the trial judge and will not be reversed absent an abuse of discretion. See *Konkel v. Bob Evans Farms, Inc.*, 165 F.3d 275, 279 (4th Cir.1999), *cert. denied*, 528 U.S. 877, 120 S.Ct. 184, 145 L.Ed.2d 155 (1999). Applying this standard, this court has established that a jury verdict is "permitted to stand unless, under Rule 50(b), no substantial evidence is presented to support the award ... or, under Rule 59, the verdict is 'against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice.' " *Mattison v. Dallas Carrier Corp.*, 947 F.2d 95, 100 (4th Cir.1991) (citations omitted).

■ On appeal, the defendants argue that the district court erred in denying the defendants' motion for judgment as a matter of law under Va.Code Ann. § 18.2–105. Section 18.2–105, in pertinent part, provides,

A merchant, agent or employee of the merchant, who causes the arrest or detention of any person pursuant to the

---

5. The case was divided into liability and damage phases, and decided on special verdicts the form of which is not objected to.

[petit larceny statute] shall not be held civilly liable for unlawful detention ... provided that, in causing the arrest or detention of such person, the merchant, agent or employee of the merchant, had at the time of such arrest or detention probable cause to believe that the person had shoplifted or committed willful concealment of goods or merchandise.[6]

Thus, whether the district court's denial of the defendants' motion for judgment as a matter of law was in error rests on whether the jury could reasonably conclude that the defendants did not have probable cause to believe that Stamathis had shoplifted. Because we believe that there was sufficient evidence for the jury to come to this conclusion, we affirm the decision of the district court.

■■■■ Under Virginia law, "probable cause is defined as knowledge of such facts and circumstances to raise the belief in a reasonable mind, acting on those facts and circumstances, that the plaintiff is guilty of the crime of which he is suspected." *Stanley v. Webber,* 260 Va. 90, 96, 531 S.E.2d 311 (2000) (citing *Lee v. Southland Corp.,* 219 Va. 23, 26, 244 S.E.2d 756 (1978); *Bain v. Phillips,* 217 Va. 387, 394, 228 S.E.2d 576 (1976); *Gaut v. Pyles,* 212 Va. 39, 41, 181 S.E.2d 645 (1971)). Thus, in order to establish merchant immunity in this case, a jury would have to find that the defendants had probable cause to believe that (1) Stamathis removed Flying J's fuel from the Flying J premises, (2) without the consent of Flying J, and (3) with the intention of depriving Flying J of its fuel permanently. See *Bright v. Commonwealth,* 4 Va.App. 248, 356 S.E.2d 443, 444 (1987) (citing *Dunlavey v. Commonwealth,* 184 Va. 521, 524, 35 S.E.2d 763 (1945)). The defendant bears the burden of proving probable cause as an affirmative defense under Section 18.2–105.

There is no question but that the jury was properly instructed as to the meaning of probable cause and the elements of petit larceny, to which instructions exception is not taken.[7] The claims of malicious prosecution and defamation were submitted to the jury with special interrogatories, to which the defendants had no objection. The first question of the special interrogatory read as follows:

> Have the defendants proven by a preponderance of the evidence at the time of Stamathis' arrest, defendants had probable cause to believe that Stamathis was guilty of larceny; that is, that he had stolen fuel?

The jury responded "no" to this question, establishing that they believed that the defendants did not have probable cause to believe that Stamathis was guilty of larceny. We are of opinion that there was sufficient evidence to support this finding.

It is apparent from the record that Stamathis repeatedly tried to pay for his fuel and that Hansen saw this and knew that

---

**6.** Va.Code Ann. § 18.2–105 (1996) is the statute in effect at all times relevant to this case. § 18.2–105 was since repealed and, with no change pertinent here, reenacted as part of Va.Code Ann. § 8.01–226.9 (2004) by Acts 2004 c. 462.

**7.** The jury was instructed as follows:

> In order to have probable cause to believe that Stamathis was guilty of larceny, defendants must have had probable cause to believe that, one, Stamathis removed fuel from Flying J premises; two, without the consent of Flying J, and three, with the purpose or intent of not paying the purchase price of the fuel.
>
> Probable cause is knowledge of facts and circumstances that would reasonably induce the belief in the mind of an ordinarily prudent person that Stamathis was guilty of larceny.
>
> In determining probable cause, you must view the facts and circumstances as they reasonably appear to the defendants.

Stamathis had come into the store "to pay for his fuel." Stamathis gave his T–Chek and Frequent Fueler cards to Miss Bowman twice (once in the store and once on the phone), which contained his name and enabled Flying J to access other identifying information about him. Both Hansen and Miss Bowman knew that Stamathis was a driver for J–Mar and that all of the information necessary to complete the transaction, minus the mileage, was already in the computer. Stamathis tried on several occasions to give his mileage to Miss Bowman in order to complete the transaction, and was not trying to withhold or conceal this information from her.

In addition to Stamathis' repeated attempts to pay for the fuel and his offering of identifying information to Flying J (i.e. T–Chek card, Frequent Fueler Card, employer, truck number), it was a very busy night and the Flying J employees had to have been aware that there was minimal parking and extensive line-ups for fuel. Hansen knew that when the Flying J parking lot was full, truckers would use the Citgo lot to park. Thus, Stamathis parking at the other lot would not have been extraordinary. When Stamathis was moving his truck to make room for other truckers wishing to fuel, he drove slowly out of the parking lot, *by-passing* the ramps to the interstate, and parked his truck at the neighboring Citgo lot. Both Miss Bowman and Hansen saw this and knew that he was at the Citgo lot. In addition, upon directing the deputy to have Stamathis arrested and when swearing out the warrant, there was testimony that Hansen did not explain that Stamathis had repeatedly tried to pay for the fuel.[8]

Taking into account all of the facts and circumstances presented to the jury, we conclude that the jury was quite justified in finding that Flying J and Hansen did not prove by a preponderance of the evidence that there was probable cause to believe that Stamathis intended to steal the fuel and that he was guilty of larceny. Accordingly, we affirm the district court in its finding that Section 18.2–105 does not provide defendants with immunity as a matter of law.

### III.

The defendants' remaining issues relate to the amount of compensatory and punitive damages that the jury awarded.

### A.

■ With respect to compensatory damages, the defendants contend that the award was excessive in light of Stamathis' actual out-of-pocket expenses. Whether this verdict should be set aside as excessive is a matter of Virginia law. *Gasperini v. Center for Humanities*, 518 U.S. 415, 438, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). The Virginia Supreme Court has held:

When a verdict is challenged on the basis of alleged excessiveness, a trial court is compelled to set it aside "if the amount awarded is so great as to shock the conscience of the court and to create the impression that the jury has been motivated by passion, corruption or prejudice, or has misconceived or misconstrued the facts or the law, or if the award is so out of proportion to the

8. Indeed, even the statement Hansen signed on the criminal complaint may be construed to support Stamathis' version of what happened:

Called in to get fuel cashier ask him for info said he would bring in the info came in cashier said needed mileage he get mad walked out and drove off lot with fuel went to sent [r]y station & parked told me he was finding a place to park got smart to deputy to arrest him.

injuries suffered as to suggest that it is not the product of a fair and impartial decision."

*Shepard v. Capitol Foundry of Va., Inc.,* 262 Va. 715, 720–21, 554 S.E.2d 72 (2001) (quoting *Edmiston v. Kupsenel,* 205 Va. 198, 202, 135 S.E.2d 777 (1964)). Because setting aside a verdict as excessive is within the discretion of the trial court, we review for abuse of discretion. See *Shepard,* 262 Va. at 720–21, 554 S.E.2d 72 (citing *Poulston v. Rock,* 251 Va. 254, 258–59, 467 S.E.2d 479 (1996)); see also *Gasperini* at 438, 116 S.Ct. 2211.

The defendants argue that because Stamathis submitted evidence of only approximately $10,000 in actual out-of-pocket expenses and loss that the jury award of $250,000 is unsupported. While the defendants are correct that Stamathis submitted evidence of his loss of income and his necessary expenses that amounted to approximately $10,000, this is not to say that Stamathis did not introduce evidence that supported the remaining portions of the award.

The jury in this case was properly instructed, without objection, what they should consider in arriving at compensatory damages. The district court instructed the jury, "In determining damages to which Mr. Stamathis is entitled, you should consider any of the following which you believe by the greater weight of the evidence was caused by the defendant's wrongful conduct: One, loss of income; two, necessary expenses; three, insult; four, pain; and five, mental suffering. Your verdict shall be for such sum as will fully and fairly compensate Mr. Stamathis for damages sustained as a result of the wrongful conduct." Thus, when considering the award in this case, the jury considered not only the $10,000 of actual out-of-pocket loss and expenses, but also Stamathis' insult, pain, and mental suffering.

Given the facts of this case, we are of opinion that the award is not so great that it shocks the conscience of the court, suggests unfairness, is motivated by passion, corruption or prejudice, is based on misconception, or is so out of proportion as to suggest unfairness.

Stamathis was arrested, taken into custody, and booked for petit larceny. In addition to the humiliation and embarrassment Stamathis suffered just from these events, he faced further insult with respect to his relationship with his employer. Hansen had called Stamathis' employer prior to Stamathis' arrest and told them that Stamathis had driven off without paying for fuel, thereby jeopardizing his future employment with the company. Not only was Stamathis' employer made aware of the incident, Stamathis lost 93 days of work to attend to his state court appearances for the larceny charge. His employer made no allowance for his time off from work, contributing to his emotional distress. Additionally, Stamathis testified how badly the entire incident had affected him, had "eaten him up inside" and caused him to lose sleep. Furthermore, the defendants did not present any witnesses during the damages phase of the trial to rebut Stamathis' testimony regarding his insult, pain, and mental suffering.

In consideration of all the evidence and in view of the consequences that this incident had on Stamathis' livelihood and reputation, we are of opinion and hold that the compensatory damages award of $250,000 was justified in this case. In that respect, we note that the jury was not instructed on the theory that the charge of petit larceny in the discharge of the duties of Stamathis were defamatory words which are actionable *per se* under the law of Virginia: words which impute to a person unfitness to perform the duties of an office or employment of profit, or want of

integrity in the discharge of the duties of such an office or employment. See *Fleming v. Moore*, 221 Va. 884, 888–89, 275 S.E.2d 632 (1981). The critical distinction between defamation *per se* and other actions for defamation is that a person so defamed is presumed to have suffered general damages, and any absence of actual injury is considered only in diminution of damages. While no point is made on appeal of this rule, and was not made below, it is mentioned to show the extent to which Virginia law protects a person in his employment from such slanderous charges as affected Stamathis.

### B.

■ With respect to punitive damages, the defendants assert three errors. First, the defendants argue that the punitive damages award must be reversed because Stamathis did not introduce any evidence that Flying J acted with actual malice. Second, the defendants contend that Virginia law requires reversal because the excessive punitive damages award was the product of passion and prejudice. Lastly, the defendants argue that under *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) the punitive damages award was unlawful and did not provide the defendants with fair notice of the penalty to which they would be subject. We will address each argument in turn.

■ In cases involving malicious prosecution or defamation claims, punitive damages may be awarded if the defendant demonstrates, by clear and convincing evi-

dence, that the defendant acted with actual or express malice. See *Williams v. Garraghty*, 249 Va. 224, 236, 455 S.E.2d 209 (1995).[9] Actual malice is defined as "conduct which is in conscious disregard of the rights of others and is wanton and oppressive." *Nat'l Carloading Corp. v. Astro Van Lines, Inc.*, 593 F.2d 559, 565 (4th Cir.1979).

We point out first that the jury, without objection, was properly instructed on the necessity of finding actual malice in order to award punitive damages. The court instructed,

> [Y]ou have discretion to award punitive damages if you find, one, that defendant acted for the purpose of causing injury to plaintiff, or, two, the defendant acted in deliberate disregard for plaintiff's rights.[10]

The defendants raised no objection to this instruction, which was approved in substantially the same form in *Williams*, 249 Va. at 236, 455 S.E.2d 209. We are of opinion and decide that the jury could find that the defendants acted with actual malice as instructed.

The district court addressed this issue in deciding post-trial motions and concluded:

> The matter is no more complicated than this: a jury could reasonably conclude that defendants acted without probable or reasonable cause and with actual malice. A jury could have reasonably concluded that defendant, David L. Hansen, clearly understood that plaintiff had no intention of stealing fuel, and yet because Hansen became angry he *directed*

---

**9.** We note that this is the standard generally applied to an award of punitive damages. At trial, the jury was not instructed as to the clear and convincing evidence standard. The defendants did not then raise this objection to the jury instructions, and do not raise it now, however. Regardless, we find it unnecessary to determine whether a clear and convincing

standard was waived because we find that there were sufficient facts shown with which a jury could reasonably find that actual malice was shown by clear and convincing evidence.

**10.** See the complete instruction at n.13, *infra*.

a local deputy sheriff to arrest Stamathis, directions that the local deputy sheriff blindly followed. Defendants then pursued Stamathis criminally, not in the interest of justice, but rather to protect themselves from liability.

■ We agree with the district court. We have held above that there was sufficient evidence to find that Hansen did not have probable cause to believe that Stamathis was stealing fuel. While we acknowledge that lack of probable cause alone does not infer actual malice, see *Giant of Va., Inc. v. Pigg,* 207 Va. 679, 686, 152 S.E.2d 271 (1967), it does lend support to a finding that the defendants acted with actual malice. The defendants knew that Stamathis had tried to pay for his gas three times while parked in the Flying J lot, and also knew a significant amount of information about Stamathis from his Frequent Fueler and T–Chek cards. Hansen and Miss Bowman saw Stamathis bypass the freeway entrance and park his truck at the neighboring lot, thus removing doubt that Stamathis had planned to just fuel up and proceed down the highway. Yet, despite any lingering questions that the defendants may have had as to whether Stamathis intended to pay, they called the police and Stamathis' employer, stating that Stamathis had in fact driven off without paying for fuel. The charges were pressed even after a dispatcher from J–Mar assured Hansen that she would get the situation taken care of, if given a minute, thereby indicating that J–Mar would pay Flying J for Stamathis' fuel.[11] But Hansen pressed charges, nevertheless, and had Stamathis arrested.

The jury also heard evidence that Hansen was angry because Stamathis was complaining and arguing with him, and Hansen told the deputy to arrest Stamathis because he did not want to argue with Stamathis anymore. Hansen was well aware that Stamathis was not going to be arrested absent Hansen's directive, yet Hansen requested Stamathis' arrest and proceeded to swear out a criminal complaint against him. There was also evidence that Hansen did not tell Deputy Hall or the magistrate about Stamathis' attempts to pay for the fuel, but rather indicated that Stamathis had tried to pay with some form of payment that Flying J would not accept.

In light of all the evidence, we do not agree with the defendants' contention that Stamathis failed to introduce any evidence of actual malice. On the contrary, we are of opinion there was sufficient evidence for the jury to come to the conclusion that the defendants acted with malice as defined, without objection, in the jury instructions. Additionally, we disagree with the defendants' position that this case is indistinguishable from *Pigg,* 207 Va. at 686, 152 S.E.2d 271, and from *F.B.C. Stores, Inc. v. Duncan,* 214 Va. 246, 198 S.E.2d 595 (1973). *Pigg* affirmed a trial court which, in its discretion, had set aside an award of punitive damages, and *Duncan* affirmed a trial court ruling that there was no evidence to support a claim of punitive damages.

■ We now turn to whether the punitive damages award was unlawful under Virginia law because it was the product of passion and prejudice. "[A] jury's award of damages may not be set aside by a trial court ... unless the damages are so excessive ... as ... to create the impression that the jury has been influenced by

---

11. We must reiterate that J–Mar paid for Stamathis' fuel. Therefore, J–Mar was going to pay the bill regardless. Once Hansen spoke with J–Mar and the dispatcher assured Hansen that she would take care of the situation, it seems apparent that, at the very least, Flying J did not need to fear not getting paid for the fuel.

passion or prejudice or has in some way misconceived or misunderstood the facts or the law. . . ." *Downer v. CSX Transportation, Inc.*, 256 Va. 590, 594, 507 S.E.2d 612 (1998). That being said, "a trial court will not set aside a verdict either as inadequate or as excessive merely because the court may have awarded a larger or smaller sum had it been the trier of fact." *Downer*, 256 Va. at 594, 507 S.E.2d 612 (citing *Reel v. Ramirez*, 243 Va. 463, 467–68, 416 S.E.2d 226 (1992)). The action of the trial court is reviewed for abuse of discretion. See *Reel* at 467, 416 S.E.2d 226.

In support of their contention that the jury's verdict was based on improper considerations, the defendants claim that plaintiff's counsel portrayed Stamathis in a manner designed to evoke sympathy from the jury and that he unlawfully made appeals to the jury's regional biases by emphasizing Flying J's net worth and the fact that it is an out-of-state corporation. While plaintiff's counsel argued the fact of Flying J's financial status and also mentioned that Flying J is an out-of-state corporation,[12] we are of opinion that, read in context, the comments were not so egregious, even if any, as to be considered designed to inflame the jury.

■■■ First, a defendant's financial position is a proper consideration in assessing punitive damages, see *Pacific Mut.*

*Life Ins. Co. v. Haslip*, 499 U.S. 1, 22, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). Thus, it was not error to comment on Flying J's net worth. Even when read in conjunction with statements pertaining to where the defendant's corporate headquarters were based, we do not feel that counsel's statements rose to a level that they prejudiced the jury. Rather, we feel plaintiff's attorney's argument went no further than to stress to the jury that the defendants' behavior was egregious and necessitated punishment, and that the punishment should be such that it would deter the defendants and others like them from doing this again. Indeed, the jury was instructed, "the law allows but does not require the jury to award punitive damages. The purpose of punitive damages is, one, to punish a wrongdoer for extraordinary misconduct and, two, to warn others against doing the same."[13] Thus, the jury was aware of the requirements for awarding punitive damages and the purpose therefor. A jury is presumed to follow the instructions of the court. See *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987); *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 501 (4th Cir.2001). Accordingly, we hold that the district court did not abuse its discretion in refusing to set aside the punitive damages award based on improper considerations.

---

12. The fact that Flying J's headquarters are in Ogden, Utah was a fact in evidence.

13. The jury was fully instructed on the requirements of punitive damages and when punitive damages are appropriate. The entire instruction follows, to which the defendants did not object:

In this case, you have discretion to award punitive damages if you find, one, that defendant acted for the purpose of causing injury to plaintiff, or, two, the defendant acted in deliberate disregard for plaintiff's rights.

You may award an amount of punitive damages which all jurors agree is proper. In fixing the amount, you should consider the following questions: One, how offensive was the conduct; two, what amount is needed to prevent repetition in light of defendants' financial condition; and three, has the amount a reasonable relationship to actual damages awarded?

If you do award punitive damages, you should fix the amount using calm discretion and sound reason. You must not be influenced by sympathy for or dislike of any party in the case.

Finally, the defendants contend that the punitive damage award must be reversed because they did not receive fair notice, under *BMW*, that a penalty of this amount could be awarded. See *BMW*, 517 U.S. at 574, 116 S.Ct. 1589 (stating that fairness dictates that persons should receive "fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose"). In *BMW*, the Supreme Court established that courts should look to three factors in assessing whether a punitive damages award violates due process: (1) the reprehensibility of the conduct; (2) the ratio between the punitive damages awarded and the harm likely to result, as well as the harm that actually has occurred; and (3) the difference between the punitive damages awarded and the civil or criminal penalties that could be imposed for comparable conduct. *BMW*, 517 U.S. at 574–75, 116 S.Ct. 1589.

First, as to the reprehensibility of the act, we cannot ignore that the jury found that the defendants did not have probable cause. Thus, the defendants had Stamathis arrested, booked for petit larceny, and pushed for prosecution when they did not have probable cause to believe that Stamathis had actually stolen fuel. Not only was Stamathis deprived of his liberty in being taken into custody and booked, but the humiliation and stigma and expense that accompany a criminal arrest are significant. Before the police had even arrived to make a determination regarding Stamathis' actions, Hansen had called Stamathis' employer and told them that Stamathis had stolen fuel, thereby damaging his reputation and trust with his employer. Stamathis was forced to absent himself from his job for some three months in order to accommodate his court appearance and faced up to a year in prison and a fine of $2,500. See Va.Code Ann. § 18.2–96 (classifying petit larceny as a Class 1 misdemeanor); § 18.2–11 (providing that a Class 1 misdemeanor carries a maximum sentence of confinement in jail for not more than twelve months and a fine of not more than $2,500). The fact that the defendants continued to press charges against Stamathis, although he was visible in a nearby parking lot and had attempted to pay for his gas three times, indicates that their actions were sufficiently reprehensible in this case to justify the award.

As to the ratio between the actual harm inflicted on Stamathis to the amount of the punitive damages award, any difference is reconciled without difficulty. The defendants contend that Stamathis' actual harm is solely his out-of-pocket damages amounting to just over $10,000, which is 1/35 the amount of the punitive damages award. We think that the defendants are confusing Stamathis' out-of-pocket expenses with his damages. The jury awarded Stamathis $250,000 in compensatory damages for his loss of income and attendant expenses, and also for his insult, pain, and mental suffering we have discussed above. This amount is more than half of the jury award and only $100,000 less than the punitive damages awarded in this case, which is below the ratios that have been viewed as adequate in the past under English statutes. *BMW*, 517 U.S. at 580–81, 116 S.Ct. 1589 (stating that for years "double, treble, or quadruple damages" have been representative of sufficient punishment). Thus, we decide that the ratio between the punitive and compensatory damages was not excessive.

Finally, we are asked to compare the punitive damages award to the civil or criminal penalties that could be imposed. There are no statutory civil penalties imposed under Virginia law, however, Section 18.2–105 does provide a merchant with notice of possible actions that might lie should a merchant unlawfully detain some-

one. In this case, the defendants were on notice that should they not have probable cause for the arrest, they faced civil liability for unlawful detention, slander, malicious prosecution, false imprisonment, false arrest, or assault and battery. See Va.Code Ann. § 18.2–105. The defendants were also well aware that in such civil actions, it would be possible for a plaintiff to present evidence sufficient to justify an award of punitive damages and that the cap of a punitive damages award in Virginia is $350,000. Va.Code Ann. § 8.01–38.1.

With respect to any criminal penalties, the Virginia Criminal Code provides that, in proper circumstances, defendant Hansen could be found to have violated Section 18.2–461, which makes it unlawful to give a false report on the commission of any crime to any law-enforcement official with intent to mislead or without just cause. Va.Code Ann. § 18.2–461. The jury found that Hansen lacked probable cause to believe that Stamathis was indeed stealing the fuel. Thus, the report that Hansen made to the police officer indicating that Stamathis stole the fuel might be a false report under § 461. As this crime is classified as a Class 1 misdemeanor, Hansen could have faced up to a year in jail for his actions, along with the fine, and a conviction on his record.[14] In addition, Flying J was on notice of all applicable civil actions it could face for detention without probable cause. While the applicable civil and criminal penalties are difficult to compare to a monetary value, it seems that the award in this case was not grossly disproportionate to any comparable civil and criminal penalties that Flying J and Hansen might face.

Thus, examining the three *BMW* guideposts, we feel that the defendants had adequate notice of the possible penalties

that they could face and that the punitive damages award in this case satisfied due process concerns. Accordingly, we affirm the punitive damages award because we are of opinion and decide it does not violate either Virginia or federal law.

In conclusion, we find that there was sufficient evidence for the jury to conclude that the defendants lacked probable cause, and therefore, were not immune from liability. With respect to the compensatory and punitive damages, we are of opinion that the district court did not abuse its discretion in allowing the award of damages to stand.

Accordingly, the judgment of the district court is

*AFFIRMED.*

---

**14.** Hansen was apparently not prosecuted and was promoted and transferred to Casper, Wyoming.