No. 126,956

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CAROLYN KEMPER, as Personal Representative
of ESTATE OF DAVID KEMPER,
*Appellee/Cross-appellant*,

v.

BNSF RAILWAY COMPANY, Individually and as Successor-in-Interest to
BURLINGTON NORTHERN, INC., BURLINGTON NORTHERN & SANTA FE
RAILWAY COMPANY, and ATCHISON, TOPEKA, AND SANTA FE RAILWAY COMPANY,
*Appellants/Cross-appellees*.

SYLLABUS BY THE COURT

1.

Compensatory damages are awarded to make a person whole. A plaintiff may not recover compensation multiple times for the same injury.

2.

Equitable principles permit a defendant in a case under the Federal Employers' Liability Act (FELA) to set off its responsibility for a damage judgment by any amount the plaintiff has already received from another who contributed to that same injury.

3.

Parties are bound by the facts to which they stipulate. They may not later claim those same facts are unresolved or disputed.

4.

The United States Supreme Court has limited a surviving spouse's recovery under FELA to pecuniary damages.

5.

Courts may look to state law to fill gaps left in federal statutes as long as the state law does not conflict with the governing federal policies.

6.

Under Kansas law, a plaintiff seeking pecuniary damages need not provide a detailed accounting of the value of every monetary loss because a jury can convert the described losses into monetary equivalents based on its own experience.

Appeal from Wyandotte District Court; CONSTANCE M. ALVEY, judge. Oral argument held May 20, 2025. Opinion filed January 23, 2026. Affirmed in part, reversed in part, and remanded with directions.

*David R. Cooper*, of Fisher, Patterson, Sayler & Smith, LLP, of Topeka, and *Andrew Reitman, William R. Floyd*, and *Kathryn Lewis*, of Hall & Evans, LLC, of Denver, Colorado, for appellants/cross-appellees.

*Earl Landers Vickery*, pro hac vice, of Vickery Shepherd, LLP, of Houston, Texas, and *Kahlie M. Hoffman* and *Thomas J. Dickerson*, of Dickerson Oxton, LLC, of Kansas City, Missouri, for appellee/cross-appellant.

Before WARNER, C.J., CLINE and COBLE, JJ.

WARNER, C.J.: Courts in civil cases are often called to address harms that are lasting and extensive, altering the trajectory of people's lives in difficult and permanent ways. Courts cannot reverse time. Many injuries, once suffered, cannot be undone. So instead, the court system imposes monetary damages to compensate parties' injuries in an equitable and legally appropriate manner.

Several legal, practical, and equitable principles guide the questions of when and to what extent damages are appropriate. For example, from a legal standpoint, the United States Supreme Court has held that in some instances a person may only recover damages for pecuniary—that is, monetary—losses they have suffered, rather than for emotional losses rooted in a person's anguish and grief. But practically speaking, when a person is proving those monetary losses, they need not provide a detailed accounting of every loss; they need only provide sufficient detail so a jury can evaluate the nature and extent of the injury. And equity also comes into play: In most instances, a person who has been harmed may recover damages only to compensate for their injuries; they are not entitled to capitalize on their injuries by recovering damages above and beyond those losses.

This case involves all three principles. In December 2020, David Kemper sued the BNSF Railway Company under the Federal Employers' Liability Act, a federal statute allowing railroad employees to recover for injuries caused by their employers' negligence. David alleged that BNSF negligently exposed him to asbestos, which caused him to develop mesothelioma. David passed away before trial, and his wife Carolyn was substituted as the plaintiff. She amended the complaint and sought survival damages on behalf of David's estate and wrongful-death damages on her own behalf. After a trial, the jury found that BNSF's negligence was a contributing cause of David's mesothelioma and awarded $1.5 million in damages—$1 million for the survival claim and $500,000 in pecuniary damages for Carolyn's wrongful-death claim.

From the outset of the case, BNSF maintained that it was entitled to a setoff for any payments the Kempers received from other sources of legal compensation for David's mesothelioma. By the end of trial, the Kempers had received nearly $610,000 in settlement payments from dozens of asbestos bankruptcy trusts and over $40,000 in disability benefits from the Department of Veterans Affairs. BNSF asked the district court to offset the damages the jury awarded by the amount of these payments. But the court declined, holding that the federal law giving rise to the suit bars setoffs.

3

BNSF appeals this ruling, claiming that the district court's decision is inequitable and at odds with courts across the country that have considered this question. It also challenges Carolyn's recovery for her wrongful-death claim, arguing that federal law limits this recovery to pecuniary damages and asserting that Carolyn did not sufficiently prove her monetary losses to support the jury's verdict.

After carefully reviewing the record and the parties' arguments, we affirm the wrongful-death damages. But we agree with BNSF that the payments the Kempers received from other entities to compensate for David's asbestos exposure must be set off from the FELA damages the jury awarded to the estate, which were found to cover all losses David suffered as a result of his mesothelioma. Thus, we reverse the district court's judgment on this point and remand with directions to allow the setoff BNSF requests.

FACTUAL AND PROCEDURAL BACKGROUND

In November 2020, David was diagnosed with mesothelioma—a form of lung cancer caused by exposure to asbestos. A month later, he sued BNSF under the Federal Employers' Liability Act (FELA), a federal statute allowing railroad employees to pursue negligence claims against their employers. 45 U.S.C. § 51. David asserted that he had been employed by BNSF as a technician for nearly three decades and that BNSF's negligence exposed him to asbestos during his work around "insulation, steam lines, traction motors, brake shoes, and gaskets." David alleged that his mesothelioma was caused "in whole or in part" by BNSF's failure to provide a reasonably safe working environment.

BNSF claimed, among other things, that even if it were ultimately liable for David's injuries, it was entitled "to offset or deduct" any other compensation that David had received relating to his mesothelioma.

4

The case proceeded toward trial. Near the close of discovery, BNSF asked the court to enter an order declaring that BNSF was entitled to a setoff for any settlements David had received from asbestos bankruptcy trusts. BNSF alleged that David had already received over $580,000 from dozens of asbestos trusts and would likely receive more. The district court held a hearing on BNSF's motion for setoff, but it ultimately reserved judgment until a time closer to trial.

On January 30, 2022, David Kemper died. His wife Carolyn was substituted as the plaintiff. In that capacity, she filed an amended petition—asserting claims on behalf of David's estate and adding a claim for wrongful-death damages on her own behalf.

*The jury finds in favor of Carolyn.*

The case was tried to a jury in May 2023. Before trial, the parties stipulated that David had been diagnosed with mesothelioma and that this illness had been caused by his exposure to asbestos. They also stipulated that David would have lived for 11 more years if he had not suffered from cancer. Thus, the issues at trial largely related to causation (that is, was the mesothelioma caused by David's work at BNSF or by something else?) and damages.

At trial, Carolyn offered evidence of David's employment history. David joined the Navy in 1965 and served on the USS Lynde McCormick, a guided missile destroyer, first as a firefighter apprentice and later as a boiler technician. He left the Navy in 1969 and began working as a machinist at the Rock Island Railroad. In 1977, David left that position and began working for the Santa Fe Railroad—which later became BNSF.

While working at BNSF, David was responsible for replacing the traction motors that powered locomotive wheels. He also replaced brake shoes and gaskets, which

sometimes required him to use an abrasive grinder, leaving "dust and black particles" covering "[his] work clothes and everything." David had previously testified that he never remembered BNSF providing any training on the dangers of asbestos or posting warning signs in his work area. Nor did he remember ever wearing respiratory protection while he worked—it either "wasn't available or [he] didn't think about it."

Based on this evidence, the industrial hygienist opined that David was likely exposed to asbestos while replacing traction motors because many locomotives at the time had pipes insulated by asbestos that ran "very close" to these motors. And by using a grinder to replace brake shoes and gaskets, asbestos was likely released into David's "breathing zone." Thus, the industrial hygienist testified that he believed David's time working at BNSF "definitely" increased his risk of developing mesothelioma. And the expert physician agreed, opining that David's exposure to asbestos while at BNSF likely contributed to his diagnosis.

During BNSF's case-in-chief, it presented testimony from a naval researcher and analyst, who testified that military members exposed to asbestos could seek benefits from the Department of Veterans Affairs (VA) when their mesothelioma was service-related. The researcher testified that the VA had awarded David a 100% disability benefit, which indicated its acknowledgment that his mesothelioma was caused by his service in the Navy.

As the trial wound down, Carolyn asked the court to permit her to seek nonpecuniary damages in her wrongful-death claim. Carolyn acknowledged that United States Supreme Court precedent foreclosed this argument in the FELA context, but she maintained that the Court might reconsider the issue and reverse course. To that end, she urged the district court to allow the jury to award nonpecuniary damages and then set that judgment aside to avoid another potential trial. The district court denied Carolyn's request, noting that its job was "not to change the law, but to apply it."

6

The jury ultimately found that BNSF's negligence was a contributing cause of David's mesothelioma and eventual death. It awarded $1 million to the estate for David's conscious pain and suffering and $500,000 in pecuniary damages to Carolyn individually.

*BNSF seeks to limit the judgment against it.*

Following the jury verdict, Carolyn moved for an entry of final judgment notwithstanding BNSF's intent to seek a setoff. With this motion, Carolyn included an updated spreadsheet detailing the payments of nearly $610,000 the Kempers received from asbestos trusts and confirmed that David received over $40,000 in disability benefits from the VA. Carolyn acknowledged that several other courts had allowed setoffs in similar situations and conceded that "there is some facial appeal to the notion that there should be no 'double recovery.'" But she maintained that FELA prohibited this setoff and argued that BNSF should seek contribution from other potential joint tortfeasors in a separate lawsuit instead.

The district court agreed with Carolyn, finding setoffs were "expressly prohibited by [FELA, specifically] 45 U.S.C. § 55" and contrary to United States Supreme Court precedent. It thus entered a final judgment against BNSF for the full $1.5 million award.

The next day, BNSF filed a renewed motion for setoff, arguing that 45 U.S.C. § 55 did not apply and emphasizing that the payments the Kempers received were "compensation for the very same injuries for which [they had] sued BNSF." In support, BNSF cited several cases in which courts had set off FELA damage awards by payments the plaintiffs received from third parties as compensation for their alleged damages. As for the Kempers' claim of undercompensation, BNSF noted that the jury had been instructed to determine the total damages caused by the mesothelioma without regard to outside payments and, after hearing all the evidence, had concluded that Carolyn was

7

entitled to $1.5 million. Thus, with the jury's verdict rendered, BNSF argued that the estimated values provided by the various asbestos-trust proceedings were immaterial. After a hearing, the court again denied BNSF's request.

In the meantime, BNSF also moved to alter or amend the judgment, complaining that there was insufficient evidence to support the $500,000 pecuniary-damages award in Carolyn's wrongful-death claim. BNSF argued that because Carolyn had not provided proof establishing the value of David's services, the jury was left to speculate as to the extent of her losses. The district court denied this motion as well.

BNSF now challenges two aspects of the district court's rulings following the jury verdict. BNSF again argues the district court should have reduced the estate's damages by the amount the Kempers received from settlements with the asbestos bankruptcy trusts and the disability benefits David received from the VA. BNSF also argues the district court should have reduced Carolyn's pecuniary-damages award from $500,000 to $57,200—the amount it claims the trial evidence supports. Carolyn also cross-appeals, arguing that the district court was wrong to limit her wrongful-death award to pecuniary damages.

DISCUSSION

In 1908, Congress passed the Federal Employers' Liability Act to provide a uniform remedy for railroad employees injured on the job. *Norfolk & Western R. Co. v. Liepelt*, 444 U.S. 490, 493 n.5, 100 S. Ct. 755, 62 L. Ed. 2d 689 (1980); H.R. Rep. No. 1386, 60th Cong., 1st Sess., 3 (1908). FELA was a congressional response to the nation's growing alarm over the number and severity of railroad injuries and the inconsistent and often inadequate remedies available under a "patchwork of state legislation" and rigid common-law doctrines. *South Buffalo R. Co. v. Ahern*, 344 U.S. 367, 371, 73 S. Ct. 340, 97 L. Ed. 395 (1953); see *Norfolk Southern R. Co. v. Sorrell*, 549 U.S. 158, 165, 127 S.

Ct. 799, 166 L. Ed. 2d 638 (2007). To that end, Congress designed FELA as a "compensation scheme" that sought to "'shift[] part of the human overhead of doing business'" from the railroads' employees onto the railroads themselves. *Sorrell*, 549 U.S. at 179 (Ginsburg, J., concurring); *Consolidated Rail Corporation v. Gottshall*, 512 U.S. 532, 542, 114 S. Ct. 2396, 129 L. Ed. 2d 427 (1994).

To do so, FELA created an exclusive federal cause of action that held a railroad liable to its employees for any injury or death caused "in whole or in part" by the railroad's negligence. 45 U.S.C. § 51. FELA also did away with several common-law defenses that railroads had traditionally used to preclude recovery. *C. & O.R. Co. v. Stapleton*, 279 U.S. 587, 590, 49 S. Ct. 442, 73 L. Ed. 861 (1929); 45 U.S.C. §§ 51-54. For example, FELA eliminated a common-law rule that barred recovery for harm caused by a coworker's negligence; it replaced strict contributory negligence with comparative fault, which reduces the damages award in proportion to the employee's own negligence; and, in 1939, it abolished the assumption-of-risk defense. 45 U.S.C. §§ 51, 53-54.

Since FELA's enactment, courts have liberally construed its provisions in light of its "'humanitarian'" and "'remedial goal[s].'" *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 691-92, 131 S. Ct. 2630, 180 L. Ed. 2d 637 (2011). But the United States Supreme Court has noted that this remedial purpose does not require courts to "interpret every uncertainty in the Act in favor of employees." *Sorrell*, 549 U.S. at 171; *Gottshall*, 512 U.S. at 542-43.

Instead, interpretation of FELA's provisions must be "limited by the historical realities of the time in which it was enacted." *Nordgren v. Burlington Northern R. Company*, 101 F.3d 1246, 1250 (8th Cir. 1996); see *Monessen Southwestern R. Co. v. Morgan*, 486 U.S. 330, 337, 108 S. Ct. 1837, 100 L. Ed. 2d 349 (1988). This is because FELA was not a wholesale rejection of the common law, but a targeted modification of it. *Monessen*, 486 U.S. at 337. Put another way, because FELA was founded upon

9

"common-law concepts of negligence and injury," it only departed from common-law rules "to the extent of [its] explicit statutory alterations." *Urie v. Thompson*, 337 U.S. 163, 182, 69 S. Ct. 1018, 93 L. Ed. 1282 (1949); *Gottshall*, 512 U.S. at 543-44. As a result, when FELA is silent on an issue, a court's interpretation must be informed by the common-law principles that existed at the time FELA was enacted. *Sorrell*, 549 U.S. at 166; *Monessen*, 486 U.S. at 337.

1. *BNSF is entitled to a setoff of any compensation the plaintiffs have already received for their injuries.*

BNSF first argues that the district court should have set off—that is, reduced—the estate's damages by any amount the Kempers received from the VA and asbestos bankruptcy trusts. The district court found that the plain language of FELA did not permit this type of setoff. BNSF argues that this ruling is contrary to the majority rule across jurisdictions and results in a practical expansion of the estate's damages beyond what the jury decided.

We agree in principle with this argument, though we frame the issue somewhat differently. BNSF's setoff request presents two questions—one legal and one factual:

- First, from a legal standpoint, does FELA permit setoffs for payments a plaintiff received from non-FELA sources as compensation for the same harm caused by the railroad's negligence? We conclude that the answer is yes.

- Second, do the facts show that the Kempers received payments for asbestos exposure and to what extent? Although this issue was presented to the district court, the court found that setoffs are not available as a matter of law and did not reach the factual question. But because the evidence relating to that factual question is undisputed, we agree that a setoff is appropriate.

10

Ultimately, we reverse the district court's denial of BNSF's request and remand for entry of judgment allowing BNSF to offset its responsibility for the damage judgment by the other amounts the Kempers received to compensate David for his injuries.

*45 U.S.C. § 55 does not prohibit the type of setoff BNSF seeks.*

Our analysis begins with the language of FELA itself. The parties agree that FELA's only mention of a setoff is found in 45 U.S.C. § 55. That statute generally bars railroads from contracting with a plaintiff to exempt the company from liability for covered injuries or taking some other similarly defensive action:

> "Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void: *Provided*, That in any action brought against any such common carrier under or by virtue of any of the provisions of this chapter, such common carrier may set off therein any sum it has contributed or paid to any insurance, relief benefit, or indemnity that may have been paid to the injured employee or the person entitled thereto on account of the injury or death for which said action was brought."
> 45 U.S.C. § 55.

Carolyn points out that this language discusses a setoff only as it relates to any amount a railroad contributed to an insurance or relief fund for the employee's benefit (a matter irrelevant to the case before us). She argues that because 45 U.S.C. § 55 expressly provided for this type of a setoff but remained silent as to the type of setoff BNSF seeks here, Congress intended the statute to implicitly bar a damages setoff in FELA cases. We disagree.

Our review of the history of 45 U.S.C. § 55 shows that the statute was enacted to address a specific problem—preventing railroads from using contracts or other "creative agreements or arrangements" with employees to escape the liability imposed by FELA's

11

other provisions. *Nordgren*, 101 F.3d at 1251. During deliberations on the bill, Congress emphasized railroads' "widespread attempts" to "contract themselves out of the liabilities" imposed by state laws. *Duncan v. Thompson*, 315 U.S. 1, 6, 62 S. Ct. 422, 86 L. Ed. 575 (1942).

For example, railroads routinely "insist[ed] on a contract with their employees" that essentially released the railroads from any liability for workplace injuries. 42 Cong. Rec. 4436 (1908). While these contracts had been upheld by the United States Supreme Court, an increasing number of state courts had voided the contracts for lack of consideration when the release was offered only in exchange for "wages and . . . employment." 42 Cong. Rec. 4527 (1908); see *Baltimore & Ohio &c. Railway v. Voigt*, 176 U.S. 498, 20 S. Ct. 385, 44 L. Ed. 560 (1900); 42 Cong. Rec. 4436 (1908). And yet many state courts upheld these agreements when the release was offered in exchange for the creation of an "insurance or indemnity fund" managed by the railroads' "relief departments." 42 Cong. Rec. 4436 (1908); 42 Cong. Rec. 4527 (1908).

But there was a catch. Although these relief departments purported to act as insurance for the employee, in practice, they mostly existed to "discharge the [railroad] from every possible liability." 42 Cong. Rec. 4436 (1908). Railroads often made it a condition of employment that employees apply "for membership" in the railroad's relief program and "agree to be bound by all the regulations" of the relief department. 40 Cong. Rec. 7918 (1906). Thus, Congress adopted 45 U.S.C. § 55 to target the railroads' foreseeable use of quasi-contractual legal instruments to try contracting around the liability that FELA's other provisions meant to impose. See U.S. Statutes at Large, Vol. 35, Stat. 66 (1909), 60th Congress ("Attempts to evade liability by contract, etc., void.").

This interpretation aligns with the United States Supreme Court's interpretations of 45 U.S.C. § 55 since its enactment. See *Howard v. Illinois Cent. R. Co.*, 207 U.S. 463, 537, 28 S. Ct. 141, 52 L. Ed. 297 (1908) (45 U.S.C. § 55 prohibited "the employee [from

entering] into a contract renouncing his right to damages"); *Gottshall*, 512 U.S. at 542-43 (45 U.S.C. § 55 "prohibited employers from exempting themselves from FELA through contract"); *Sorrell*, 549 U.S. at 168 (45 U.S.C. § 55 "prohibited employers from contracting around the Act"); *McBride*, 564 U.S. at 708 (45 U.S.C. § 55 "barred employees from contractually releasing their employers from liability") (Roberts, C.J., dissenting). Thus, 45 U.S.C. § 55 does not expressly prohibit the type of setoff BNSF seeks.

Even so, Carolyn argues that if 45 U.S.C. § 55 does not expressly prohibit this kind of setoff, it does so implicitly. She reasons that because 45 U.S.C. § 55 only provided for a setoff in one situation—in which the railroad had contributed to an insurance or relief fund—this meant that 45 U.S.C. § 55 prohibits all other forms of setoff. Again, we do not find this argument persuasive.

Courts across the country have long recognized that other types of equitable relief and adjustments are available in FELA actions. *Hogue v. Southern R. Co.*, 390 U.S. 516, 518, 88 S. Ct. 1150, 20 L. Ed. 2d 73 (1968) (holding that while the plaintiff's release of the railroad for $105 did not bar recovery, the "sum paid shall be deducted from any award determined to be due to the injured employee"); *Downer v. CSX Transportation, Inc.*, 256 Va. 590, 596, 507 S.E.2d 612 (1998) (finding that a defendant may bring a counterclaim, which may reduce the ultimate damages award, without violating 45 U.S.C. § 55). If Congress wished to limit these equitable considerations in the railroad context, it could have done so by adopting statutory language to that effect. But it did not.

And Carolyn's proposed interpretation of 45 U.S.C. § 55 suffers from a more fundamental flaw; it ignores FELA's historical background. FELA was enacted against the backdrop of the common law and altered only what it expressly changed. This means that FELA's express approval of one application of a setoff does not imply the rejection

of all others. In short, 45 U.S.C. § 55 has no application to this case or bearing on our decision.

*Federal common law allows this kind of setoff.*

Because 45 U.S.C. § 55 does not address the permissibility of this kind of setoff, we must look to the state of the common law at the time FELA was enacted. When FELA was enacted in 1908, courts almost universally prohibited a plaintiff from "recover[ing] compensation twice in respect of the same injury." *The "Atlas,"* 93 U.S. 302, 310, 23 L. Ed. 863 (1876); see *Miller v. Union Pacific R. Co.*, 290 U.S. 227, 236, 54 S. Ct. 172, 78 L. Ed. 285 (1933) (citing several federal decisions ranging from 1883 to 1913); Restatement (Third) of Torts § 24 (2000). Practically speaking, this rule allowed a defendant to offset any amount the plaintiff had received from previous judgments that had been secured against another joint tortfeasor. *Lovejoy v. Murray*, 70 U.S. 1, 5, 18 L. Ed. 129 (1865). This rule "applied to compensatory payments by nonparties as well, thus preventing or diminishing recovery in many situations in which the collateral benefits rules would now permit full judgment against the tortfeasor." *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 221 n.30, 114 S. Ct. 1461, 128 L. Ed. 2d 148 (1994) (citing Prosser, Law of Torts § 109, pp. 1105-1107 [1941]).

But courts in the early 1900s were split in their treatment of situations where the plaintiff had settled with and released one of several tortfeasors before attempting to sue another. Some courts held that a release of one party operated as a release on all parties. See *Hubbard v. St. L. & M.R. Ry. Co.*, 173 Mo. 249, 72 S.W. 1073 (1903); *Seither v. Philad. Traction Co.*, 125 Pa. 397, 17 A. 338 (1889); *Abb v. Northern Pacific Ry. Co.*, 28 Wash. 428, 433-34, 68 P. 954 (1902) (holding that release of one jointly and severally liable tortfeasor that contained an express reservation of rights against a second tortfeasor nevertheless barred the plaintiff from suing the second tortfeasor). Others treated these settlements as "only a partial satisfaction," meaning that while the other tortfeasors were

not relieved from liability for the "residue of the damage," these settlement payments were regarded as "a satisfaction *pro tanto*" of the remaining liability. *Parry Mfg. Co. v. Crull*, 56 Ind. App. 77, 84-85, 101 N.E. 756 (1913) (collecting cases); see *Carey v. Bilby*, 129 F. 203, 206-07 (8th Cir. 1904); *Sloan v. Herrick*, 49 Vt. 327, 328, 1877 WL 7483 (1877) (holding that a recovery or release of one joint tortfeasor for "part satisfaction" did not bar a claim against another "for so much of the tort as remains unsatisfied," as long as the release stated that the payment was only a partial satisfaction of the injury).

In either case, however, a person who caused injury to another would—at a minimum—be allowed to offset any damage award by any compensation the plaintiff had received from other responsible parties for the plaintiff's injuries. Thus, under the common law at the time FELA was enacted, BNSF would have been entitled to reduce its responsibility to pay the damage judgment by the amount the Kempers had received as compensation from other joint tortfeasors.

This principle remains unaltered today. *McDermott*, 511 U.S. at 208 ("It is generally agreed that when a plaintiff settles with one of several joint tortfeasors, the nonsettling defendants are entitled to a credit for that settlement."); 47 Am. Jur. 2d Judgments § 787 ("[P]artial satisfaction has the effect of a discharge pro tanto."); Restatement (Second) of Torts § 885 (1979) ("A payment by any person made in compensation of a claim for a harm for which others are liable as tortfeasors diminishes the claim against the tortfeasors, at least to the extent of the payment made, whether or not the person making the payment is liable to the injured person and whether or not it is so agreed at the time of payment or the payment is made before or after judgment.").

While the United States Supreme Court has not yet addressed this issue, the overwhelming consensus among lower courts supports BNSF's position. See *Schadel v. Iowa Interstate R.R.*, 381 F.3d 671, 678 (7th Cir. 2004); *Benson v. CSX Transp. Inc.*, 274 F. Appx. 273, 276 (4th Cir. 2008) (unpublished opinion); *Hutchins v. Anco Insulations,*

*Inc.*, 625 F. Supp. 3d 504, 508 (E.D. La. 2022); *Mancini v. CSX Transp., Inc.*, No. 08-CV-933, 2010 WL 2985964, at *7 (N.D.N.Y. 2010) (unpublished opinion); *Krueger v. Soo Line R.R.*, No. 02-C-0611, 2005 WL 2234610, at *1 (E.D. Wis. 2005) (unpublished opinion); *IL Cent. R. Co. v. Oakes By & Through Hagan*, 237 So. 3d 149, 151-53 (Miss. 2018); *Strasburg v. Union Pacific R. Co.*, 286 Neb. 743, 751, 839 N.W.2d 273 (2013); *Hess v. Norfolk S. Ry. Co.*, 106 Ohio St. 3d 389, 393-96, 835 N.E.2d 679 (2005); *Downer*, 256 Va. at 596.

The case that best represents the majority approach in this situation is the Mississippi Supreme Court's decision in *Oakes*. There, the plaintiff sued a railroad under FELA for negligently exposing the decedent to asbestos. The jury awarded $250,000 in total damages, but because the decedent had been 80% at fault, the district court reduced the award to $50,000. The railroad then sought further reduction of the damages award, citing the plaintiff's receipt of over $65,000 in compensation from asbestos trusts for the same harm. The district court denied this request, and the Mississippi Court of Appeals affirmed. But the Mississippi Supreme Court reversed, holding that FELA did not preclude the railroad from a setoff for these settlement payments. 237 So. 3d at 151-54.

Like the railroad in *Oakes*, BNSF is entitled to a setoff in this case for any payments David and his estate already received for his injuries. The only distinction between this case and *Oakes* is that the plaintiff in *Oakes* was comparatively at fault, while David was not. The district court viewed that difference as dispositive, concluding that, unlike the earlier case where it had granted BNSF a setoff, BNSF was not entitled to one here because David bore no fault for the harm. But that reasoning was misplaced. Under FELA, a plaintiff's comparative fault reduces their recovery in proportion to their share of responsibility for the harm; it does not affect the defendant's right to a setoff.

From our review, the only court to adopt a contrary approach was a panel of the Missouri Court of Appeals. *Palmer v. Union Pacific R. Co.*, 311 S.W.3d 843, 856 (Mo.

16

Ct. App. 2010). In that case, the panel concluded that "an allowance of setoff for settlement recoveries received on behalf of a nonrailroad tortfeasor" was contrary to both FELA's statutory language and the Supreme Court's decision in *Norfolk & Western R. Co. v. Ayers*, 538 U.S. 135, 161-65, 123 S. Ct. 1210, 155 L. Ed. 2d 261 (2003). *Palmer*, 311 S.W.3d at 856.

But as we have noted, FELA contains no express bar on setoffs of this kind. Nor does *Ayers* compel the conclusion reached by the Missouri court. In *Ayers*, the Court held that fault could not be apportioned among joint tortfeasors in FELA cases. So a plaintiff may recover full damages from the railroad, which must then seek contribution from any other potential joint tortfeasors on its own. 538 U.S. at 141. But that is not the issue here. BNSF is not seeking to recover money from a third party or to apportion its fault compared with Kemper's previous employers that also contributed to his asbestos exposure. Thus, we—like the majority of courts that have considered this question—find that nothing in *Ayers* undermines BNSF's entitlement to a setoff. In fact, *Ayers* implicitly recognized—or at the very least, did not question—the practice of reducing damages awards based on "settlements with non-FELA entities." 538 U.S. at 144.

In sum, courts have long recognized that compensatory damages are awarded to make a person whole, and thus a plaintiff may not recover compensation multiple times for the same injury. These same legal and equitable principles apply in FELA cases. Thus, a defendant in a FELA case is entitled to set off its responsibility for a damage judgment by any amount the plaintiff has already received from another who contributed to that same injury. The district court erred when it found that FELA did not permit a setoff.

*BNSF is entitled to a setoff for any payments the Kempers received as compensation for David's mesothelioma.*

The fact that BNSF may be entitled to a setoff here does not end our analysis, however. Instead, two questions remain. First, should that setoff reduce BNSF's responsibility by each dollar the Kempers already received (commonly called a pro tanto reduction), or should there be more of a proportional reduction based on relative fault? And second, are there factual lingering questions that must be resolved before a setoff is appropriate here?

Turning first to the nature of the setoff, courts considering FELA claims have overwhelmingly found that a pro tanto reduction is appropriate. Indeed, although the Supreme Court's decision in *Ayers* provided little guidance about the availability of setoffs generally in FELA cases, the Court's language in that case is instructive on how any potential setoff should be applied. *Ayers* prohibited apportioning fault in FELA cases, concluding that federal law imposed joint and several liability on anyone who contributed to the claimed injury, with the goal of ensuring that a FELA plaintiff can recover the full amount of their damages. See *Ayers*, 538 U.S. at 162. Given this rationale, it would not make sense to require courts to apportion fault on the "back end" when that issue had not been presented to the jury. See *Schadel*, 381 F.3d at 678; but see *Marsh v. Continental Insurance Company*, No. 21-2185, 2023 WL 2632798, at *2-3 (E.D. La. 2023) (unpublished opinion).

We hold that BNSF is entitled to a dollar-for-dollar setoff for any payments the Kempers received from non-FELA sources as compensation for the same harm underlying the Kempers' claims against BNSF.

The factual question that remains is whether the payments the Kempers received were indeed meant to compensate them for the same harm caused by BNSF's negligence.

18

The parties agree that the district court did not reach this question, as it erroneously found that a setoff was not legally appropriate. At oral argument, BNSF urged this court to resolve this factual question on the appellate record, as no one disputed various asbestos trusts and the VA had made payments to David for his asbestos exposure—the only question was whether those payments should offset BNSF's damages.

In her posttrial motion before the district court, Carolyn stipulated that asbestos trusts had paid David $608,586.27 for his claims "as a result of his mesothelioma." She also admitted that David "received 13 disability checks from the VA as a result of his Navy exposures" totaling $40,903.46. But she offered two arguments as to why these payments should not reduce BNSF's liability: First, she claimed that federal law does not permit a setoff against a FELA award—a claim we have already rejected in this opinion. Second, she argued that the damages award should only be reduced by the net amount of money David ultimately received from the award, after attorney fees and other payments—an argument for which she offers no support. See *Russell v. May*, 306 Kan. 1058, 1089, 400 P.3d 647 (2017) (unsupported arguments raised incidentally in a brief are deemed abandoned).

Carolyn also argues that David was not paid the full amount of his claims from the asbestos trusts, so he should be allowed to reduce the $608,586.27 paid by those trusts to reflect their relative value to his claim against BNSF. But FELA does not allow tortfeasors to apportion their damages. Instead, as we have noted, the FELA claim against BNSF sought the full value of damages attributable to David's mesothelioma from all sources and then held BNSF jointly and severally liable with any other tortfeasors for causing those injuries. The jury in this case found that David (represented by his estate) had suffered damages in the amount of $1,000,000 as a result of his mesothelioma, even though the plaintiffs sought significantly greater amounts at trial.

Appellate courts are not factfinders, and we are thus loath to bind the parties when a district court has not rendered any factual findings on a question. But parties are also bound by the facts to which they stipulate. They may not later claim those same facts are unresolved or disputed. *Double M Constr. v. Kansas Corporation Comm'n*, 288 Kan. 268, 269, 202 P.3d 7 (2009). Carolyn's posttrial motion indicated that the payments David had received—and the reasons he received them—were "Undisputed Material Facts." As such, we agree that under these circumstances there is nothing left for the district court to resolve regarding what amounts should be offset from BNSF's damages.

The district court erred when it found that BNSF was not entitled to any setoff for other compensation David received for his mesothelioma. Under the undisputed facts here, BNSF is entitled to offset the damages owed by $649,489.73—the total payments made from the asbestos trusts and the VA to David, as listed in Carolyn's posttrial Motion for Entry of Final Judgment. We thus reverse this portion of the district court's judgment and remand with directions to enter a judgment reflecting this setoff amount.

2. *Carolyn's pecuniary-damages award is supported by sufficient evidence.*

BNSF next claims that Carolyn failed to present sufficient evidence to support the $500,000 in pecuniary damages that the jury awarded for her wrongful-death claim.

At trial, both Carolyn and her daughter testified regarding David's contributions to the household. They explained that David had done "anything and everything" around the house—"He cleaned, he cooked," he gardened, and he cut the grass on their quarter-acre property. Following his retirement from BNSF, David began working at a carwash approximately 14 hours a week, earning about $100 weekly. Additionally, during their time together, Carolyn had faced multiple cancer diagnoses, and David had accompanied her to all her medical appointments and essentially served as Carolyn's caregiver.

20

Under FELA, when a railroad's negligence causes an employee's death, it is liable "for the benefit of the [employee's] surviving widow." 45 U.S.C. § 51. But the United States Supreme Court limited a surviving spouse's recoverable "benefit" to only "pecuniary" damages—damages that "can be measured by some standard." *Mich. Cent. R.R. v. Vreeland*, 227 U.S. 59, 68, 71, 33 S. Ct. 192, 57 L. Ed. 417 (1913).

In BNSF's view, Carolyn was required to provide enough evidence to establish the monetary "value" of David's services—how often he performed them, how much time they took, and what they were worth. While it concedes that Carolyn was entitled to $57,200 based on the evidence about David's job at the carwash—$100 a week multiplied by David's 11-year life expectancy—BNSF maintains that the remaining testimony was too general and vague to support the balance of the jury's award. BNSF claims Carolyn should have presented testimony from an expert witness, like a "life care planner or an economist," so that the jury was not left to rely on "conjecture and speculation" in determining the total monetary value Carolyn suffered from David's death.

As we have noted, the Supreme Court in *Vreeland* held that spousal benefits under FELA are limited to pecuniary damages that "can be measured by some standard." 227 U.S. at 71. The Court provided no further explanation of this requirement, but we can glean insight as to its contours from other portions of the *Vreeland* decision.

Perhaps most apparent, the *Vreeland* Court used the term "pecuniary" to distinguish between the categories of damages that can be measured in dollars from those that cannot. The Court emphasized that FELA was meant to compensate those people that had been financially dependent on the decedent and was not meant to extend to everyone who may have suffered the "loss of society and companionship" of the deceased, as those losses "are not capable of being measured by any material standard." 227 U.S. at 73. The Court recognized that the death of a loved one may cause extreme grief and suffering, but it emphasized this is a category of harm that "cannot be measured . . . by money." 227

21

U.S. at 71; see *Am. R.R. of Porto Rico v. Didricksen*, 227 U.S. 145, 149-50, 33 S. Ct. 224, 57 L. Ed. 456 (1913).

Second, the Court's description of what constitutes pecuniary damages—any loss that "can be measured by some standard"—illustrates the broad scope of activities that are recoverable in these claims. *Vreeland*, 227 U.S. at 68, 71. Pecuniary damages include more than just lost earnings and other explicit monetary payments. 227 U.S. at 71. They also encompass anything the plaintiff could have reasonably expected to receive from the decedent, which, in the decedent's absence, must now be secured at a cost from another source—including services such as "'care and advice.'" 227 U.S. at 73.

Finally, *Vreeland* made clear that a plaintiff is only entitled to recovery if they provide evidence to establish that the losses they complained of actually occurred. 227 U.S. at 74. This is because with "neither allegation nor evidence of such loss of service, care, or advice," the jury is "left to conjecture and speculation" when determining how much monetary harm the plaintiff suffered. 227 U.S. at 74; see *Garrett v. Louisville & Nashville R.R.*, 235 U.S. 308, 313, 35 S. Ct. 32, 59 L. Ed. 242 (1914) (affirming the dismissal of the suit brought by the parents of the decedent because their petition contained "no positive averment of pecuniary loss"); *Gulf, Colorado &c Ry. Co. v. McGinnis*, 228 U.S. 173, 175, 33 S. Ct. 426, 57 L. Ed. 785 (1913) (holding that the adult daughter of the decedent was not entitled to pecuniary damages because there was no evidence that she suffered any "actual pecuniary loss").

But while these insights provide some guidelines for what constitutes pecuniary damages, they provide no instruction for how a plaintiff might *prove* such damages to a jury. Nevertheless, courts may look to state law to fill gaps left in federal statutes as long as the state law does not conflict with the governing federal policies. *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 98-99, 111 S. Ct. 1711, 114 L. Ed. 2d 152 (1991).

Indeed, federal courts have long reiterated that the "existence of a complex federal statutory scheme does not automatically show that Congress intended courts to fill its gaps with rules of federal common law." *Marsh v. Rosenbloom*, 499 F.3d 165, 181 (2d Cir. 2007). Instead, in instances where federal statutory regulation is "'comprehensive and detailed,'" courts may presume that matters Congress left unaddressed were "'left subject to the disposition provided by state law.'" 499 F.3d at 181. FELA provides the sole statutory framework governing liability of railroad companies to their employees. See *Vreeland*, 227 U.S. at 67 ("[I]n respect of state legislation prescribing the liability of such carriers for injuries to their employees while engaged in interstate commerce, this act is paramount and exclusive."). Though Congress could have addressed how those railroad workers must prove their injury, it did not. Thus, we look to principles of state law to resolve this question.

Looking to our own state's law, the Kansas Supreme Court clarified the requirements for proving pecuniary damages in *Wentling v. Medical Anesthesia Services*, 237 Kan. 503, 508, 514, 701 P.2d 939 (1985). There, the defendant argued that the plaintiff had failed to provide sufficient evidence to recover pecuniary damages in his wrongful-death claim for the death of his wife when he did not provide "any evidence of the dollar amount" of the services he lost. 237 Kan. at 506. The defendant had claimed—much like BNSF does here—that, at a minimum, the plaintiff was required to provide the jury with "monetary figures sufficient to calculate both the value of the loss and the proposed compensation." 237 Kan. at 508. But the Kansas Supreme Court rejected this argument, holding that a plaintiff is entitled to recovery if they present evidence establishing "the nature and extent of [their] losses." 237 Kan. at 514. The court reasoned that the plaintiff need not provide specific monetary figures setting out the value of those lost services because a jury is "presumed to be capable of converting the losses into monetary equivalents on the basis of their own experience." 237 Kan. at 514.

Our Supreme Court's holding in *Wentling* aligns with the policy underlying FELA. FELA was enacted in response to the nation's growing alarm over the number and severity of railroad injuries and the inconsistent and often inadequate remedies available under a "patchwork of state legislation" and rigid common-law doctrines. *Ahern*, 344 U.S. at 371. FELA thus sought to expand railroad workers' access to remedies, not limit it under unnecessarily strict requirements.

Here, Carolyn presented evidence that David cleaned, cooked, did yardwork, gardened, cut the grass on their quarter-acre property, and cared for Carolyn during her illnesses. There is no dispute that Carolyn suffered the losses that she and her daughter testified about. Nor is there a dispute that these activities were "valuable per se and pecuniary in nature." *Wentling*, 237 Kan. at 514. Under *Wentling*'s rule, Carolyn was not required to present evidence detailing the monetary value of such losses to recover here. She presented testimony establishing both the nature and extent of the services that David had provided. And that was enough. The jury determined that David's death caused Carolyn to suffer $500,000 in pecuniary damages. We will not second-guess that determination on appeal.

We affirm Carolyn's pecuniary-damages award.

3. *Carolyn is not entitled to nonpecuniary damages in her FELA wrongful-death claim.*

In Carolyn's cross-appeal, she argues that the district court should have allowed her to recover nonpecuniary damages in her wrongful-death claim. She candidly concedes, however—both in her appellate brief and at oral argument—that this court is bound by the limitation imposed by *Vreeland*. She simply seeks to "articulate and preserve [this] argument" in hopes that the United States Supreme Court takes her appeal and reverses *Vreeland*'s pecuniary-damages limitation.

As Carolyn recognizes, we are duty-bound to follow United States Supreme Court precedent on issues of federal law absent some indication that it is departing from its previous position. *State v. Patton*, 315 Kan. 1, 16, 503 P.3d 1022 (2022). There is no such indication here. See *Dutra Group v. Batterton*, 588 U.S. 358, 372, 139 S. Ct. 2275, 204 L. Ed. 2d 692 (2019); *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32, 111 S. Ct. 317, 112 L. Ed. 2d 275 (1990). Thus, we affirm the district court's judgment limiting Carolyn's recovery to pecuniary damages only.

CONCLUSIONS

The district court erred when it denied BNSF's request for a setoff of payments the Kempers had already received from other sources as compensation for exposure to asbestos. Consistent with the overwhelming majority of jurisdictions to have considered this question, we hold that federal law permits this type of setoff, which balances the need to compensate a person for their injuries with a safeguard against multiple recoveries for the same injury when a jury has defined the extent of a person's losses. Because the plaintiffs have admitted the extent of those payments and that the payments were compensation for David's asbestos exposure, a setoff is warranted here.

Carolyn provided sufficient evidence of her pecuniary losses in her wrongful-death claim. Neither federal nor Kansas law required her to provide dollar amounts for each monetary loss she suffered; the information provided to the jury as to the nature and duration of the loss was sufficient to support the jury's damage verdict.

This court is bound by United States Supreme Court caselaw governing FELA, and the Court has held that only pecuniary damages—and not nonpecuniary damages for pain and suffering—are available in wrongful-death actions based on that Act.

Affirmed in part, reversed in part, and remanded with directions.

25